# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| CHARLOTTE CONNER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| LIFE INSURANCE COMPANY | ) |
| OF NORTH AMERICA, | ) |
| | ) |
|     Defendant. | ) |

## **COMPLAINT**

    COMES NOW Plaintiff, Charlotte Conner, and for her claims and causes of action against Defendant, Life Insurance Company of North America, states as follows:

## PARTIES

1. Charlotte Conner ("Conner") is a resident and citizen of the State of Missouri.

2. Defendant Life Insurance Company of North America ("LINA") is an out-of-state insurance company authorized to do business in the State of Missouri. The Commissioner of the Missouri Department of Insurance is authorized to accept service of process on behalf of LINA.

## JURISDICTION AND VENUE

3. Conner brings her claim pursuant to Employment Retirement Income Security Act ("ERISA") and 29 U.S.C. § 1001 *et seq.*

4. This dispute is governed by a welfare benefits plan and its policy documents, as well as applicable federal law regarding employer provided benefits. 29 U.S.C. § 1132(e)(1).

1

5. This Court also has subject matter jurisdiction pursuant to the general jurisdictional statute for civil actions arising under federal law. 28 U.S.C. § 1331.

6. Venue lies in the District of Missouri under 29 U.S.C. § 1332(e)(2), as the breach occurred in this district, and because the welfare benefits plan is administered in this district.

7. Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to this action occurred within this judicial district.

## INFORMATION REGARDING TRIAL

8. No jury trial is allowed under ERISA law.

## STATEMENTS OF FACT

9. Since 2015, Conner was employed by Shook, Hardy & Bacon, L.L.P. (SH&B), as an Accounting Support Specialist.

10. Conner's job duties included tracking travel, claims, and witnesses; taking care of receipts and payments; taking calls and answering client questions; running numbers for reports, verifying air and ground information; coordinating travel for employees and lawyers; scheduling, tracking, and paying bills for hotels, airline tickets, and travel agencies; and occasionally moving 40-to-50-pound boxes full of paper. In addition, Conner was a lead worker as she was the only accountant that performed her duties.

11. During 2020, Conner lived with her family, who noted Conner's disability progression. Her mother's statement describes that in June 2020 she noted Conner was having trouble getting onto the computer and forgetting passwords. Connor would get up from the computer and just walk in circles. Toward the end of 2020, Conner's mother noted that Conner kept asking the same questions over and over, even if she was just told the

2

answer. Conner's mother then noticed she was forgetting to time in for work, was getting calls from her supervisor, and was making notes on what she needed to do. In addition, during the months of June and July 2020, Conner had several performance related conference calls with her employer.

12. Conner's disability progression continued until Conner's supervisor asked her to begin the Employee Assistance Program. Conner's mother noted that Conner required reminders to complete basic tasks such as bringing down dirty clothes, dishes, and taking a bath.

13. Conner suffers from a combination of major depressive disorder, anxiety, cognitive deficits, short-term memory loss, vertigo, difficulty focusing, difficulty completing tasks, and hypertension.

14. SH&B sponsored a group welfare benefits plan for its participating employees ("Plan").

15. The Plan constitutes an employee welfare benefit plan as defined by 29 U.S.C. § 1002(1).

16. The Plan offered short-term disability ("STD") and long-term disability ("LTD") benefits to its participating employees.

17. At all relevant times, Conner has been a participant and covered person by the administrator of the Plans.

18. LINA is the administrator of the Plans.

19. SH&B delegated or attempted to delegate the function of issuing STD and LTD claim determinations to LINA.

20. Cigna was the original claims administrator. LINA took control of the claim administration thereafter.

21. SH&B and LINA entered into an administrative services contract through which SH&B paid LINA for acting as claims administrator.

22. On August 6, 2020, due to her combination of impairments, Conner was unable to work. Conner submitted a long-term disability ("LTD") claim.

23. Upon initiating the claim, Conner's counsel was told that a claim number would be assigned within 3-5 business days. At the time of the initiation, Conner's counsel made it clear that they were the attorney representing Conner and provided written verification.

24. At the same time, Conner's counsel attempted to initiate a short-term disability ("STD") claim for benefits. Counsel was informed that Conner did not elect for STD and so she did not qualify. Paystubs provided during this period show that STD was provided.

25. On April 19, 2021, LINA sent a letter directly to Conner, despite being informed that she was represented by counsel during her claim's telephonic initiation.

26. On April 26, 2021, Conner's counsel was contacted by LINA's Group Claims Associate who requested treating providers and clarification regarding her disability, and a medical authorization signed. LINA additionally asked for a Social Security Disability Claim filing, which is not a requirement to meet the policy definition of disability.

27. On April 26 and April 27, 2021, LINA again contacted Conner directly.

28. On April 28, 2021, Conner's counsel returned various documents to LINA. These included an Activities of Daily Living Questionnaire, a medical authorization, Conner's work and medical history, and Mrs. Carolyn Conner's recorded observations regarding her daughter's disability.

29. On May 12, 2021, Conner's counsel sent over a notice of representation including their statutory lien and Conner's pay stubs. Further information was provided on request in the

ensuing months, including Cigna's repeated requests for medical records, a completed SSA form 3288, and other information requests.

30. On September 20, 2021, LINA denied Conner's claim for disability benefits.

31. Cigna's September 20, 2021 denial cites as its rational:

> The medical on file does not support a significant level of functional deficits that would preclude you from returning to your occupation as an Accounting Clerk as evidenced by the medical records that were provided to us.

32. LINA's determination that Conner's medical condition is not disabling is summarized as follows: First, Conner's job was a sedentary occupation, and second, "based on the review of the medical information obtained the only potential restriction would be that [Conner] should not engage in safety-sensitive activities while intoxicated and would not preclude you from your occupation."

33. LINA's policy language that determines whether a claimant has a "Disability/Disabled" is as follows:

> **Disability/Disabled**
> You are considered Disabled if, solely because of Injury or Sickness, you are:
> 1. unable to perform the material and substantial duties of your Regular Occupation; or
> 2. unable to earn 80% or more of your Indexed Earnings from working in your Regular Occupation.
>
> After Disability Benefits have been payable for 36 months, you are considered Disabled if, solely due to Injury or Sickness, you are:
> 1. unable to perform the material and substantial duties of any occupation for which you are, or become qualified based on education, training or experience; or
> 2. unable to earn 80% or more of your Indexed Earnings.
>
> We will require proof of earnings and continued Disability.

34. LINA failed to correctly apply the definition of disability in Conner's policy. Conner satisfies the policy definition of "Disability" because at all relevant times by reason of her illness, she has been unable to earn 80% of her Indexed Earnings. Conner additionally has been unable to perform the material and substantial duties of her Regular Occupation.

5

This fact is supported both by Conner's medical records and by her inability to continue to meet production requirements for her position which led to her eventual termination.

35. On May 12, 2021, Conner provided proof of her income to LINA in the form of her pay stubs, which record her average income through July 31, 2020. Both prior to and following Conner's termination, she has been and remains unable to return to her Regular Occupation or earn any income whatsoever. As such, Conner meets the second policy factor when determining Disability.

36. Conner's medical records further substantiate her claim that her conditions are disabling: prior to her disability, when Conner was seen by Richmond Family Clinic in October, November and December 2019, and January, and February 2020, her appointments entailed objectively minor complaints of swelling, splinters, and ear pain. Conner's appointments intensity completely changed further into 2020.

37. During the early part of her disability, when Conner was seen by Richmond Family Clinic on July 30, 2020, September 14, 2020, then later in April, June, and July 26, 2021, her appointments were markedly different. Her mid to late 2020 visits revolve around her difficulty remembering things, depression, her inability to focus, repetitive behavior due to short term memory loss, abnormal lab results, difficulty remembering her recent appointments, and continued memory loss.

38. Dr. Jamie Honeycutt, MD, as early as July 2020, noted that Conner "would likely benefit from a neuro consult." Throughout Conner's disability Dr. Honeycutt continued to work closely with Conner advising coping mechanisms, discussing routines, recommending proper nutrition and stopping alcohol consumption.

6

39. Conner saw Dr. Muhammad Shoaib, MD, on September 30, 2020, and again March 9 and 23, 2021. Dr. Shoaib documented memory problems for almost six months, likely caused by a combination of severe depression and anxiety, chronic alcohol use, and probably obstructive sleep apnea. Dr. Shoaib ordered an MRI, a CT scan of the brain, and neuropsychological testing.

40. On July 7, 2021, Conner underwent a neuropsychological assessment with Dr. Neal Deutch, Ph.D., ABN, FACPN. During that evaluation, Conner tested low on the Conner's CPT-3, Omissions test. Conner tested Low Average on the following tests:

    a. Grooved Pegboard, Dominant test;

    b. The WAIS-IV Working Memory Index, Digital Span Forward test;

    c. The CLVT III Learning Style Percent Recall Primary test;

    d. The CVLT-III Recognition, Source Recognition Discrimination, and Recognition Discriminability tests;

    e. The WMS-IV Indexes, Immediate Memory test;

    f. The WMS-IV Subtests, Logical Memory I, LM Recognition, Visual Reproduction I, and VR Recognition tests.

41. Conner tested Borderline on the following tests:

    a. CVLT-III List Learning, Trial 2 Recall, Trial 5 Recall, Total Trials 1-5, Short Delay Cued Recall tests;

    b. The CVLT-III Learning Style, Total Learning Slope test;

    c. The WMS-IV Indexes, Visual Memory test;

    d. The WMS-IV Subtests, Visual Reproduction II test; and

    e. The Executive Function Wisconsin Card Sort Test Categories Completed test.

42. Conner further scored extremely low on the following tests:

   a. The CVLT-III List Learning, Short Delay Free Recall, Long Delay Free Recall, Long Delay Cued Recall tests;

   b. The CVLT-III Recognition, Total False Positive test;

   c. The WMS-IV Indexes, Delayed Memory and Auditory Memory tests;

   d. The WMS-IV Subtests, Logical Memory II test; and

   e. The Executive Function Wisconsin Card Sort Test Perseverative Responses test.

43. Dr. Deutch opined that:

> **Personality Assessment Inventory:** Alcohol has had a negative effect on her life to an extent that is higher than average among individuals in treatment for alcohol problems. Numerous alcohol-related problems are probable, including difficulties in interpersonal relationships, on the job, and health complications. She is likely unable to cut down on her drinking despite repeated attempts at sobriety. Given this pattern, it is increasingly likely that she is alcohol-dependent and has suffered the consequences in terms of physiological signs of withdrawal, lost employment, strained family relationships, and financial hardship.
>
> Thought processes are marked by confusion, distractibility, and difficulty concentrating. She describes difficulties consistent with relatively mild or transient depressive symptomatology. In particular, she appears to have experienced a change in physical functioning in a manner associated with depression. There is likely to be disturbed sleep pattern, decreased energy level and sexual interest, and loss of appetite and/or weight.
>
> **Achenbach Behavior Checklist:** The ABCL was completed by her mother and is based on observations of the patient's behavior. Syndrome elevations are in the clinical range for withdrawn behavior, attention problems, and rule-breaking behavior. Borderline clinical elevations are noted for anxiousness/depression and aggressive behavior. Total problems are in the clinical range. DSM-oriented scales are elevated in the clinical range for depressive problems, avoidant problems, and antisocial personality problems and the borderline clinical range for anxiety problems and AD/H problems. In the informant narrative, concerns are reported for alcohol use and lack of motivation.

44. Dr. Deutch continued: "Attention and Concentration: initial focused attention as assessed by digit forward is low average… verbal learning is borderline… Region of the words with the greatest recall are words presented most recently in a list indicating forgetting. Immediate memory for word lists is borderline. Short delay free recall of word lists is extremely low. Long delay free recall of words list is extremely low. Short delayed cued recall of word lists is borderline. Long delayed cued recall of word lists is extremely low… Delayed logical memory is extremely low. Delayed visual reproduction is

8

borderline. Logically organized verbally mediated memory is extremely low. Visually mediated memory is borderline. Contrast between auditory and visually mediated memory suggests equivalent impairment. Delayed logical and visually mediated memory is extremely low. Contrast between immediate and delayed memory suggest forgetting and difficulty with encoding… Logical analysis and formation of new concepts is borderline. Perseveration scores on the WCST are extremely low which indicates severe difficulties in profiting from correction or conceptual flexibility. There is evidence of confabulation and perseveration."

45. On August 20, 2021, Conner was also evaluated by Standard Consulting, LLC, in a Disability Psychological Evaluation. Christie Nelson, PsyD, reported regarding her functionality:

> "The Auditory Memory Index (AMI) is a measure of Charlotte's ability to listen to oral information, repeat it immediately, and then recall the information after a 20 to 30 minute delay. Compared to other individuals her age, Charlotte's auditory memory capacity is in the Extremely Low Range… and exceeds that of only approximately 0.1 percent of individuals in her age group…On the Visual Memory Index… Charlotte performed in the Borderline range… Charlotte's visual memory capacity exceeds that of only approximately 4 percent of individuals in her age group. Modality-Specific Memory Strengths and Weaknesses… Compared to individuals with similar auditory memory capacity, Charlotte's visual memory performance is in the Low Average range (16th percentile), indicating that her visual memory is lower than expected, given her level of auditory memory functioning. On the Visual Working Memory Index…

9

> Charlotte performed in the Low Average range… Charlotte's visual working memory ability exceeds that of approximately 16 percent of individuals in her age group."

46. Conner supplied sufficient proof of her loss, including but not limited to medical and hospital records, pharmacy records, fully executed claim forms, and authorization enabling LINA to obtain her medical records.

47. Conner has at all relevant times met the definition of "Disability or Disabled" under the Plans and is entitled to benefits.

48. Conner has exhausted her administrative remedies.

## CAUSES OF ACTION

### COUNT I
### 29 U.S.C. § 1132(a)(1)(B) – WRONGFUL DENIAL OF BENEFITS

49. Conner realleges the preceding paragraphs as if fully set forth herein.

50. Conner is entitled to all unpaid and accrued STD and LTD benefits, as LINA:

    a. Made an unfavorable decision without substantial evidence;

    b. Failed to properly consider Conner's medical impairments and resulting limitations; and

    c. Issued an unfavorable decision that was arbitrary and capricious.

51. Pursuant to 29 U.S.C. § 1132(a)(1)(b), Conner is entitled to an award of actual damages for losses suffered.

52. Pursuant to 29 U.S.C. § 1132(g), judgment may include compensation for a beneficiary's attorney's fees, costs, and prejudgment interest.

53. LINA has not satisfied its obligation to pay Conner's STD and LTD benefits.

54. WHEREFORE, Pursuant to 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(g), Conner prays for judgment against LINA for unpaid LTD benefits, unpaid STD benefits, attorney's fees, costs, and prejudgment interest.

## COUNT II
## 29 U.S.C. § 1132(a)(3) – BREACH OF FIDUCIARY DUTY

55. Conner realleges the preceding paragraphs as if fully set forth herein.

56. Under 29 U.S.C. § 1002(21)(A), a fiduciary is one who:

    "Exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property or such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

57. 29 U.S.C. § 1104(a)(1)(A) describes the fiduciary standard of care:

    "a fiduciary shall discharge her duties with respect to a plan solely in the interest of the participants and beneficiaries and – for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

58. LINA, the Plan's designated claims administrator, is a fiduciary.

59. Conner participated in and benefitted from the Plans as previously indicated.

60. LINA's claims management practices are motivated by financial incentives in its administrative services agreement with SH&B.

61. As the payor of benefits and the entity responsible for exercising discretion in claims administration, LINA operates under an inherent conflict of interest.

62. A higher than marketplace quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008) governs the actions of a fiduciary.

63. LINA breached its fiduciary duty in:

    a. Failing to comply with its internal guidelines and claims handling procedures. Its claim handlers did not comply with documented instructions involving the administration of disability claims, including its procedures involving coverage and eligibility determinations;

    b. Failing to fully and adequately investigate and fully account for details of Conner's claims upon assuming control of the claim administration from Cigna.

    c. Refusing to utilize fully executed authorizations to attempt to obtain evidence relevant to Conner's claim for benefits;

    d. Purchasing multiple reviews of Conner's medical records and subsequent reports, each report having been made by biased entities with a financial relationship with LINA; and

    e. Failing to communicate with Conner's counsel.

64. LINA denied Conner's STD and LTD benefits claims for the purpose of elevating its financial interests. In doing so, it breached its fiduciary duties.

65. LINA failed to discharge its duties solely in the interests of its participants and beneficiaries. It acted with both a conflict of interest and breached its fiduciary duty to both Conner and the Plan's participants and beneficiaries generally.

66. LINA's improper conduct demonstrates that ordinary relief under § 1332(a)(1)(B) is not an adequate remedy.

67. LINA's violations of regulations alone allow Conner the right to pursue any remedy

under Section 502(a) or ERISA, including § 1332(a)(3). 29 C.F.R. § 2560.503(1)(2)(i).

68. LINA's violations of federal regulation also subject its decision to *de novo* review.

69. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(3), §1109, and § 1132(a)(2), Conner prays for an order that LINA retrain its employees consistent with ERISA fiduciary obligations and federal regulations; for reformation of its services agreement with the plan administrator consistent with ERISA fiduciary obligations and federal regulations; for an injunction preventing further unlawful acts by LINA in its fiduciary capacity; for an equitable accounting of benefits that LINA has withheld; for the disgorgement of profits enjoyed by LINA in withholding benefits; for restitution under a theory of surcharge; for the Court's imposition of a constructive trust; for an award of attorney fees; and for further relief as the Court deems just.

Respectfully submitted,

BURNETTDRISKILL, Attorneys

By: /s/ Derrick A. Pearce
Derrick A. Pearce, Mo. # 42793
Kyle H. Sciolaro, Mo. #64568
Paul J. Taylor, Mo. #72159
103 W 26th Ave., Ste. 290
North Kansas City, MO  64116
P: 816.781.4836
F: 816.792.3634
dpearce@burnettdriskill.com
ksciolaro@burnettdriskill.com
ptaylor@burnettdriskill.com
ATTORNEYS FOR PLAINTIFF